Paul R. Kiesel, Esq. (SBN 19854)
KIESEL BOUCHER LARSON LLP
8648 Wilshire Boulevard
Beverly Hills, California 90211
Telephone: (310) 854-4444
Facsimile: (310) 854-0812

Attorneys for Plaintiffs And The Class
(Additional Counsel On Signature Page)

FILED
CLERK, U.S. DISTRICT COURT

NOV 20 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Priority ____
Send ____
Enter ____
Closed ____
JS-5/JS-6 ____
JS-2/JS-3 ____
Scan Only ____

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re Yahoo Litigation | Master File CV-06 2737 CAS (FMOx) |
| | Jury Trial Demanded |
| | CLASS ACTION |

### CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Draucker Development, True Communication, Inc., d/b/a Metrodate.com,

Crafts by Veronica, and Mika's Wedding, individually and as Class Representatives on Behalf

of All Similarly Situated Persons, bring this action against Defendants Yahoo Inc. and Overture

Services, Inc. (collectively "Yahoo" or "Defendants").

### INTRODUCTION

1.      Defendants own and operate Internet search engines and web sites containing

news and other content, in an effort to attract visitors to their web sites. Defendants' business

depends on the sale of online advertising, and to that end Defendants sell advertisements on

Defendants' sites and on the sites of their advertising partners.

DOCKETED ON CM

NOV 22 2006

BY _____ 010

RECEIVED
BUT NOT FILED

NOV 20 2006

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION
BY                              DEPUTY

36

SCANNED

2.      Internet users can click on an advertisement to be taken to the advertiser's web site. Defendants' advertising customers, *i.e.*, Plaintiffs and the Class (defined below), pay fees, on a "per click" basis, to Defendants for advertising placements.

3.      Whether a business advertises on TV, in a newspaper, or on the Internet, the business strives to maximize the return on its advertising investment by displaying the ad in front of persons interested in the product. Advertisers such as Budweiser and Ford trucks pay premium prices for targeted ad placement during televised NFL football games. Likewise, Yahoo portrays its targeted advertising commitment and service as one in which advertisers pay premium prices in exchange for "highly targeted" ad placements.

4.      Yahoo, one of the largest providers of Internet advertising, takes full advantage of the premium prices commanded by targeted advertising placements. That is why it portrays its ad placement services as "highly targeted," placed on "high quality" web sites and sites based on the user's self-selected "search terms." That is also why Yahoo assures its prospective advertising customers that their ads will not be associated with undesirable and illegal locations such as spyware and typosquatting sites.

5.      This action arises upon Plaintiffs' discovery that Yahoo breached its promise to provide targeted advertising, by placing Plaintiffs' ads on sites that users find by accident or that are otherwise completely untargeted. This action also challenges Yahoo's misportrayal of its contractual commitment as one in which ad placement will be "highly targeted" when, in fact, Yahoo did not and does not commit to apply any targeting to the ad placements purchased by its advertising customers.

6.      Defendants' contract with Plaintiffs promises targeted advertising products that Yahoo calls "Sponsored Search" and "Content Match." In breach of the express terms of the

contract, Yahoo has routinely failed to deliver Sponsored Search and Content Match advertising to its customers. Yet Yahoo has nonetheless charged advertisers for the nonconforming advertising it did provide.

7.  Yahoo charged premium prices for Sponsored Search and Content Match advertising but did not deliver those products. Instead, Yahoo placed ads at random without any link to the users' search terms and without any "content matching." In other instances, Yahoo placed ads into spyware, typosquatting, or other placements that were neither "Sponsored Search" nor "Content Match."

8.  What is particularly egregious about Defendants' conduct is that it is completely contrary to the manner in which Yahoo promotes its ad placement products to its customers. Yahoo promotes its Sponsored Search and Content Match products as the state of the art in targeted Internet advertising. Targeted advertising is the foundation on which Yahoo has built its Internet advertising empire. Advertisers buy ad placements from Yahoo precisely because of Yahoo's promise, and contractual obligation, to deliver targeted advertising through its Sponsored Search and Content Match products.

9.  Now Plaintiffs have learned that Yahoo has been charging them premium prices for placing ads completely outside of Yahoo's Sponsored Search and Content Match products (as Yahoo itself describes those products). Instead, Defendants have placed Plaintiffs' advertisements in a variety of Internet locations without any bona fide content, including spyware pop-up ads, typosquatting sites and other Internet back alleys.

10.  Yahoo has also engaged in a widespread and uniform misrepresentation, deceit and "bait and switch." Among other things, Yahoo has promoted its advertising products as "highly targeted," but has, at the time of these promotions, intended also to provide, and has also

provided, random, untargeted placement of customers' ads. Despite these untargeted

placements, Yahoo has nonetheless charged and collected from Plaintiffs and the Class premium

advertising prices. Yahoo's promotional materials, Insertion Orders (order forms), invoices, and

even Terms & Conditions all fail to disclose the material fact that much of its ad placements

were untargeted and random, among other divergences from Yahoo's description of Sponsored

Search and Content Match.

11.     Plaintiffs assert claims individually and/or collectively for violations of common

law breach of contract, unjust enrichment, misrepresentation and civil conspiracy and for

statutory violations under the Unfair Competition Law ("UCL" or "Section 17200"), Business

and Professions Code §§ 17200 *et seq*. Plaintiffs seek actual and/or compensatory damages;

restitution; equitable relief, costs and expenses of litigation, including attorneys' fees; and all

additional and further relief that may be available.

## PARTIES

12.     Plaintiff Draucker Development is a sole proprietorship located in New

Cumberland, Pennsylvania. Draucker Development owns and operates the websites

www.lookupbook.com; www.nbleads.com; www.protected-data.net; www.cac-org.org;

www.salliemae.littlesite.net; www.usc.littlesite.net; www.workathome.littlesite.net;

www.medicaialarm.com; www.studentloan-info.org; www.amerivalues.com; www.wimax-

reports.com; and www.vitalsenior.com. At all relevant times, Draucker Development placed ads

with Defendants and paid Defendants for the placement of those ads.

13.     Plaintiff True Communication, Inc., d/b/a Metrodate.com ("Metrodate") is a

corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with

its principal place of business in Willow Grove, Pennsylvania. Plaintiff owns and operates the

4

Metrodate.com Internet website. At all relevant times, Metrodate placed ads with Defendants and paid Defendants for the placement of those ads.

14.    Plaintiff Crafts By Veronica is a New Jersey business located in Newark, New Jersey. At all relevant times, Crafts By Veronica placed ads with Defendants and paid Defendants for the placement of those ads.

15.    Plaintiff Mika's Wedding is a California business located in Los Angeles, California. Mika's Wedding owns and operates the web sites www.mikawed.com; www.weddinginvitations411.com; www.christmascards411.com; www.greetingcards411.com; www.allweddinginvitations.com; www.stationery411.com; www.engagement-rings-411.com; www.loseweightloss.com. At all relevant times, Mika's Wedding placed ads with Defendants and paid Defendants for the placement of those ads.

16.    Defendant Yahoo! Inc. ("Yahoo") is a Delaware corporation with its executive offices, principal place of business, and corporate headquarters at 701 First Avenue, Sunnyvale California 94089.

17.    Defendant Overture Services, Inc. ("Overture"), a wholly-owned subsidiary of Yahoo!, Inc., is a Delaware corporation with its executive offices, principal place of business, and corporate headquarters at 74 North Pasadena, Pasadena, California 91103, which is within this District.

## JURISDICTION AND VENUE

18.    This case is subject to original jurisdiction in this Court pursuant to the Class Action Fairness Act of 2005.

19.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because this District is the district in which one of the defendants resides and a district in which a substantial part of the events or omissions giving rise to the claim occurred.

## RELEVANT FACTUAL BACKGROUND

20.     Defendant Yahoo is one of the largest search engines on the Internet. Its business consists of operating a number of web sites and showing ads on those web sites, as well as providing ads to be shown by its various partners. Yahoo's revenues in 2005 were $5.3 billion.

21.     Defendant Overture, a wholly owned subsidiary of Yahoo, provides technology and systems for showing, tracking, and charging for search advertisements.

22.     The Class consists of entities that advertise on the Internet, and that pay Yahoo to place ads on web sites that attract persons who might be interested in the advertised goods or services.

23.     Just as traditional advertising costs more in some publications or locations than others, so too do the prices of Internet advertising vary. The market value of Internet ads is higher when the ads are shown to users who are, for example, actively seeking certain products or actively engaged in purchasing decisions for such products. Advertisers buy ads from Yahoo, at Yahoo's high prices, because Yahoo purports to offer high-quality sites with high-quality users. Yahoo specifically touts the quality of its sites and the third party sites at which Yahoo displays ads: Yahoo describes those third party sites as "popular [and] high-quality," specifically naming such distinguished partners as Microsoft, CNN, and the Wall Street Journal. *See* http://searchmarketing.yahoo.com/rc/srch/srch.php. Furthermore, Yahoo's training materials describe its Content Match advertising as appearing "along with relevant articles [and] product reviews." *See* http://searchmarketing.yahoo.com/rc/srch/eworkbook.pdf, page 98.

24. Yahoo represents to its advertising customers that its ads are only shown to users who have shown interest in corresponding products or services (*e.g.*, by conducting a related search). Yahoo promises that advertisers' ads will be "highly targeted" to such users. *See* http://searchmarketing.yahoo.com/rc/srch/srch.php.

25. In fact, the very names Yahoo has given to its two targeted advertising products, "Sponsored Search" and "Content Match," suggest on their face that those products provide targeted ad delivery. Although Yahoo's contract -- a uniform, boilerplate set of terms and conditions unilaterally imposed by Yahoo on its advertising customers -- does not define the terms "Sponsored Search" and "Content Match," Yahoo readily and prominently promotes those products on its web site as targeted ad placement products. Yahoo states that Sponsored Search advertising displays ads at search engines, to reach "search users" who are actively engaged in searching the web; and that "Content Match" advertising displays ads at content sites, showing ads "along with relevant articles, product reviews, and more." *See* http://searchmarketing.yahoo.com/rc/srch/srch.php.

26. Defendants represented that advertisement displays will be "highly targeted." *See* http://searchmarketing.yahoo.com/rc/srch/srch.php. Defendants represented that ads would be shown to users "searching for what you sell." *See* http://searchmarketing.yahoo.com/rc/srch/eworkbook.pdf, page 5. Defendants represented that "a listing for your business will appear when Internet users enter searches related to your keywords." *Id.* at 18. Defendants further represented that "relevant listings are displayed to interested users." *Id.* at 7. Defendants thereby promised only to show class members' ads when the ads are actually relevant to users' interests, as revealed through users' search terms or web browsing.

27.     Contrary to Defendants' contractual obligations, Defendants' relationships with spyware vendors, untargeted placement providers, and others have caused class members' ads to appear without any targeting whatever.  In those circumstances, advertisers pay for untargeted traffic that is worth far less than what Defendants charge, and far less than class members agreed to pay under the misportrayal that traffic would all be targeted.

28.     Furthermore, Defendants fail to disclose the material facts that Plaintiffs' and the Class's ads are displayed on an untargeted basis, as well as on a targeted basis, that "sponsored search" ads appear even when users are not conducting searches at all, and that "content match" ads are displayed in pages containing nothing but ads, without anything whatever to "match," among other material omissions.

29.     Defendants' own statements reveal the high value of targeted traffic and, conversely, the lower value of untargeted traffic.  Defendants specifically tout the benefits of targeting.  "Search results are a powerful way for customers to find your web site, because users *are actively looking* for the products or services you offer." *See* http://us.i1.yimg.com/us.yimg.com/i/us/cn/srch/hssw.swf (emphasis added).  Defendants further claim that targeted ads are "a powerful way to connect with customers who are searching for what you sell." *Id.*

30.     However, Plaintiffs' and the other class members' ads are often placed in locations on the Internet that have nothing to do with "sponsored searches" or "content matches." Without Plaintiffs' and the Class's authorization, Yahoo shows advertisers' ads in contexts that the advertisers never agreed or wanted to be associated with, including illegal spyware, pop-ups and typosquatting sites.

31.     Yahoo knowingly has manipulated that system for its own benefit, by increasing the volume of improper advertising displays during financial reporting periods when Yahoo was at risk of failing to meet investor expectations.

32.     Set forth below is a description of some of Yahoo's unlawful practices in connection with its placement of Plaintiffs' and the Class's ads.  (Yahoo's conduct alleged herein, and Plaintiffs' claims generally, comprises separate and distinct unlawful practices distinguishable from click fraud, which is the subject of other litigation, including *Checkmate Strategic Group, Inc. v. Yahoo! Inc. et al.*, Cal. CV 05-4588 CAS (FMOx), but not this litigation.)

33.     **Spyware.**  The term "spyware" refers to a broad class of unwanted software programs installed on users' computers, either without their consent or without their informed consent, that take actions averse to the users' interests such as, for example, causing unwanted and annoying pop up ads, transmitting personal information about the user, and slowing the user's computer.  Many such programs earn revenues by showing advertising, especially via pop-up ads.  Spyware has become a serious problem for Internet users.  It is estimated that spyware infects at least half of all Internet-connected computers.  Further, spyware reportedly is the subject of more than 20% of all tech support calls to Dell (a leading computer manufacturer), and reportedly causes more than half of all Windows crashes.

34.     Installing spyware on users' computers without users' consent entails committing trespass to chattels as well as computer tampering.  Installing spyware on users' computers without informed consent also violates state consumer protection statutes, and constitutes false advertising and other deceptive business practices.

35.     Advertisers want no part of spyware-delivered advertising.  Staff of the U.S. Federal Trade Commission ("FTC") and New York Attorney General's office have repeatedly instructed advertisers to be wary of spyware-delivered advertising.  Furthermore, advertisers recognize spyware for the scourge that it is, and they therefore seek to keep their ads out of spyware.

36.     Yahoo! Publisher Network Policies specifically provide that Yahoo's Syndication Partners must not show ads in pop-ups or pop-unders (advertising methods widely associated with spyware).  *See* https://publisher.yahoo.com/legal/prog_policy.php.  Defendants describe pop-up ads as "the current bane of web surfers."  *See* http://searchmarketing.yahoo.com/rc/srch/htgla_dp.php.  Yahoo's statements convey that it will not use, nor pay Syndication Partners to use or provide, such unwanted and improper forms of advertising.

37.     In fact, Yahoo has caused class members' ads to appear in spyware software programs.  In 2005 and 2006, New York Attorney General's office investigations of spyware operators Intermix and Direct Revenue revealed that Yahoo has placed class members' ads into spyware provided by those companies.  Other investigations have uncovered numerous other instances of Yahoo placing class members' ads into notorious and well-known spyware.

38.     Yahoo's use of spyware is illegal.  Yahoo has caused class members' ads to appear in spyware-delivered windows without the labeling and disclosures required by applicable regulations.  In 2002, the FTC issued labeling requirements for search engine advertising.  In violation of those rules, Yahoo has established relationships with spyware vendors that lack such labeling, causing class members' ads to be shown in violation of specific FTC instructions.

26495_1

39.     By placing class members' ads into illegal platforms such as spyware programs,
Yahoo wrongfully collects high search engine advertising fees for ads that are actually shown in
contexts that are worth far less, if anything.  It is well known that spyware advertising is much
cheaper than search engine advertising.  *See* http://www.mygeek.com/public/faq.jsp#cam02 and
http://www.metricsdirect.com/whatwedo/youradvertisingbudget.aspx (reporting prices of $0.03
or lower for spyware-delivered advertising – more than an order of magnitude lower than
Yahoo's prices).  But when Yahoo and its Syndication Partners place class members' ads into
spyware, it continues to charge class members full price for these ads, pocketing the difference
between the high fees class members pay and the low cost of providing spyware-delivered
advertising.

40.     **Typosquatting.**  Yahoo also caused class members' ads to appear within
"typosquatting" web sites.  Typosquatters register domain names, or web addresses, that are
identical or confusingly similar to the names of well-known companies, products, and
trademarks, for example "washingtopnost.com" or "cartoonnetworik.com."  If a user mistypes a
domain, the user may end up at a typosquatting site and, due to Yahoo's relationships with such
sites, may see class members' ads on such sites.

41.     Typosquatting sites are illegal under the Anti-Cybersquatting Consumer
Protection Act ("ACPA"), which prohibits registration and use of domain names that are
"identical or confusingly similar" to a trademark.  15 U.S.C. § 1125(d)(1)(A)(ii)(II).
Nonetheless, Yahoo has established relationships with typosquatting web sites, and has charged
class members fees for showing their ads in such web sites.

42.     Yahoo represents that its "Sponsored Search" product reaches "active users *on top*
*search engines.*"  *See* http://searchmarketing.yahoo.com/index.php (emphasis added).  Yahoo

further represents that ads are shown "in search results on the web's top portals and search

engines." *See* http://us.i1.yimg.com/us.yimg.com/i/us/cn/srch/hssw.swf. However, users who

have merely mistyped a web address are not "on" any search engine at all, let alone a "top"

search engine.

43.    Yahoo's use of typosquatting sites violates their contract with Plaintiffs and the

Class – because such ad placement is neither Sponsored Search nor Content Match – and violates

both settled trademark law and the ACPA.

44.    Yahoo even charges its advertising customers for ads shown on typosquatting

web sites targeting those customers' *own names*. Take for example Yahoo's advertising

customer Expedia.com. A user intending to visit the Expedia web site might mistype it as

"expedai.com." At "expedai.com," the user sees a list of ads provided by Yahoo, including an ad

for Expedia, along with other customers of Yahoo. If the user clicks the Expedia ad, the user is

taken to the true Expedia site, which is where he or she wanted to go in the first place. But as a

result of Yahoo's relationship with the typosquatter, Expedia had to pay Yahoo an advertising

fee.

45.    **"Parking" and Bulk Registration Sites.** Yahoo has also caused class members'

ads to appear within "parking" and other bulk registration sites. These sites appear if users

incorrectly guess, mis-remember or otherwise mistype a domain name. Yahoo shows class

members' ads on such "untargeted" sites, and charges class members accordingly. But class

members did not contract to buy advertising at such sites, because they are not part of the

Sponsored Search or Content Match products that Plaintiffs bargained for.

46.    **Resulting Harms.** Class members pay Yahoo a premium price for the Sponsored

Search and Content Match advertising placements for which they bargained, and which Yahoo

promised to provide. However, in addition to ad placement through Sponsored Search and Content Match, Yahoo also placed ads within spyware programs, typosquatting sites, and other untargeted sites maintained by their Syndication Partners where market prices are far less. *See* http://www.metricsdirect.com/whatwedo/youradvertisingbudget.aspx (reporting prices of $0.03 or lower for spyware-delivered advertising). *See* http://www.mygeek.com/public/faq.jsp#cam02 (reporting prices of $0.008 to $0.03 for spyware-delivered advertising). Yahoo and its partners pocket the difference, causing class members to incur un-bargained for payments to Yahoo.

47. The unlawful practices outlined herein have caused Plaintiffs and the Class harm that is separate and distinct from the harm caused by click fraud. None of the complaints in the click fraud suits against Defendants has alleged any harm caused by the practices alleged herein.

## CLASS ALLEGATIONS

48. Plaintiffs bring this action on their behalf and on behalf of all other members of the Class ("Class"), defined as:

> All persons (including companies) who contracted with one or more Defendants for advertising at any time in the six (6) years preceding the filing of the first Class Action Complaint in this action.

49. There are thousands of class members geographically dispersed throughout California and the country. Therefore, individual joinder of all members of the Class would be impracticable.

50. Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual class members. These common legal or factual questions include:

> (a) What is the meaning of the terms "Sponsored Search" and "Content Match" under Yahoo's uniform contract with the members of the Class?

(b)     Whether Yahoo breached its contract by promising and charging for, but failing to deliver, Sponsored Search and Content Match advertising;

(c)     Whether Yahoo was unjustly enriched by charging and collecting for ad placements Plaintiffs and the Class did not order, target or authorize;

(d)     Whether Yahoo misrepresented material facts and conspired with its syndication partners to artificially inflate revenues at the Class's expense;

(e)     The appropriate remedies for Yahoo's unlawful practices; and

(f)     Whether Yahoo should be enjoined from continuing its unlawful practices.

51.     Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs overpaid for Yahoo's advertising placements.  Plaintiffs are no different in any relevant respect from any other class member, and the relief sought is common to the Class.

52.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the class members they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation.  Plaintiffs and their counsel will adequately protect the interests of the Class.

53.     A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual class member likely will be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Yahoo's conduct.  Thus, it would be virtually impossible for the class members individually to effectively redress the wrongs done to them.  Moreover, even if the class members could afford individual actions, it would still not be preferable to classwide litigation.  Individualized actions present the potential for inconsistent or contradictory judgments.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

54.     In the alternative, the Class may be certified because Yahoo has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate preliminary and final equitable relief with respect to the Class as a whole.

## COUNT I

### (Breach of Contract)

55.     Plaintiffs hereby incorporate by reference the foregoing allegations as if fully set forth herein.

56.     Yahoo imposed on Plaintiffs and every other class member a contract that governs their advertising relationship.  The contracts were drafted by Yahoo and are uniform as to every one of its advertising customers.

57.     Yahoo promised to deliver to its advertising customers two products: "Sponsored Search" and "Content Match" ad placements.

58.     In breach of their contracts, Yahoo received payment for, but failed to deliver, "Sponsored Search" and "Content Match" ad placements.

59.     Defendants marketed their "Sponsored Search" and "Content Match" products as "highly targeted."  Yahoo's advertising customers select the product they want (*i.e.*, Sponsored Search, Content Match, or both), and specify the search or content terms most relevant to their particular business.  These targeting terms are material elements that form the basis of the bargain between the advertiser and Yahoo.

60.     Defendants' "Terms and Conditions" do not define the material terms "Sponsored Search" or "Content Match," even though they are the sole products Yahoo sells pursuant to those Terms and Conditions.  However, those products are described in Yahoo's marketing and promotional materials, where Yahoo claims that those products provide the "highly targeted"

functions advertisers seek. *See Keith v. Buchanan*, 220 Cal. Rptr. 392 (Cal. 2d. Dist.

1985)(marketing and promotional materials can be basis of the bargain).

61.     From these marketing and promotional materials, advertisers place their orders for

the particular advertising products they seek to buy from Yahoo. In particular, each advertiser's

"Insertion Order" form specifically references the Sponsored Search and Content Match

products. Every Insertion Order sets out the advertiser's purchase of Sponsored Search, Content

Match, or both. Yahoo has admitted that its advertising customers' Insertion Orders are part of

their contracts with Yahoo. (*See Weiss Declaration* at 3, filed in connection with Defendants'

motion to dismiss Plaintiffs' complaint.) The Insertion Orders pertain only to the two products

entitled Sponsored Search and Content Match – proper noun terms Yahoo itself created, for

which Yahoo's own statements are the best authority as to what the parties intended when

advertisers agreed to purchase those products.

62.     Yahoo's advertising products differ from more traditional and general advertising

in at least one important respect. Each advertiser in the "Sponsored Search" and "Content

Match" programs pays for advertising based on "clicks" on that advertiser's ads, not based on

assumptions or projections as to how many persons view that advertiser's ad. In other words, an

advertiser is charged only when a "click" is recorded by Yahoo or one of its partners, and not for

the mere display of an advertisement.

63.     As a result, Yahoo's disclaimer of warranty with respect to ad placement

generally has no cost to advertisers, because those advertisers are only charged if their ads have

been both displayed and "clicked." In this regard, the Terms and Conditions provide as follows:

> Overture does not guarantee that your listings will be placed in or available
> through the Sponsored Listings Marketplace Distribution Network, the Sponsored
> Listings Marketplace or the Sponsored Listings Marketplace Results, nor does

SCANNED

> Overture guarantee that your listings will appear in a particular position or rank, and Overture reserves the right to not place your listings and to stop placing or to remove your listings at any time for any reason. Final decision as to inclusion, relevancy, placement and the like is at Overture's sole discretion.

64.     This disclaimer of warranty means that Yahoo is not obligated to display Plaintiffs' ads at all.  Of course, Plaintiffs are not charged if Yahoo elects not to show Plaintiffs' ads.  Suppose the quoted language is interpreted only to allow Yahoo to decline to show Plaintiffs' ads and thus to decline payment from Plaintiffs.  Under such an interpretation, the disclaimer remains consistent with the contract's "essential purpose" – as that term is used in the Uniform Commercial Code – because Defendants do not get paid if an advertiser's ad is not placed, is stopped or is removed.

65.     However, a broader interpretation of this disclaimer would cause the contract to "fail[] of it essential purpose" as that term is used in the UCC, thereby rendering the Agreement unconscionable and/or illusory.  The Agreement would become unconscionable and/or illusory if the disclaimer were interpreted to allow Defendants to charge full price for placing ads in unwanted, untargeted, predatory or other random sites and contexts that do not conform with the targeting instructions specified in the Insertion Orders.

66.     In fact, the targeted advertising represented and promised in Yahoo's marketing materials and in the Insertion Orders submitted by Plaintiffs and the Class is not inconsistent with Yahoo's disclaimer of warranty.  That disclaimer merely allows Yahoo to reject, stop, remove or limit a customer's ad, in which event Yahoo is not paid by the advertiser.  If, by contrast, Yahoo displays the ad, the disclaimer cannot and does not allow Yahoo to wholly ignore the targeted Sponsored Search and Content Match commitments for which the advertiser has paid a premium price, and then still collect that premium payment.  Nor does the disclaimer

authorize the wholly random placement of ads, particularly when the advertiser (as with Plaintiffs and the Class) has ordered and agreed only to targeted placements. Such an interpretation would transform the Agreement into a true "bait and switch," because advertisers would be paying premium prices for generic and random ad placements.

67.    To the extent the disclaimer authorizes Yahoo to engage in entirely random placement of ads and to charge and collect premium payments for such placements, Yahoo has misrepresented the nature of its products and its contractual commitment. The marketing and the contract would constitute a classic "bait and switch," by portraying Yahoo's products and contract as promising only "highly targeted" advertising when, in fact, Yahoo intended to permit itself also to provide general and random advertising.

68.    These same principles apply to the additional disclaimers reflected in section 4 of Yahoo's Terms and Conditions. For example, the "as is" disclaimer, at most, only disclaims any implied warranty because "as is" cannot disclaim Yahoo's express affirmation and promise to charge only for "Sponsored Search" and "Content Match." Similarly, the disclaimer of liability for "Third Party" conduct is, of necessity, limited to costs incurred by Yahoo as a result of "Third Party" conduct. The disclaimer is unconscionable, against public policy and would render the contract illusory and fraudulent if it permitted Yahoo to charge for advertising placed only, for example, on one Third Party's site at which ads are selected entirely at random. Thus, these disclaimers are not inconsistent with the "highly targeted" express promises and affirmations set forth in the promotional materials and Insertion Order forms that Yahoo distributed to Plaintiffs and the Class.

69.    Moreover, Yahoo's contracts included the term, implied at law in all contracts, requiring the parties to exercise "good faith and fair dealing" in the exercise of all contractual

duties related to the performance of the contract. Yahoo breached its contractual duty of good

faith and fair dealing by collecting revenues for placements it knew, or reasonably should have

known, were illegal as well as violative of its contracts with advertisers.

70.     As a result of Yahoo's breach of contract alleged herein, Plaintiffs and the Class

have been damaged, and are entitled to be reimbursed for all charges billed or collected that were

not chargeable under the contract.

## COUNT II

### Restitution/Unjust Enrichment/Money Had and Received

71.     Plaintiffs hereby incorporate by reference paragraphs 1-54 as if fully set forth

herein.

72.     Yahoo has received, directly and indirectly, benefits in the form of payments from

Plaintiffs and the Class as a result of clicks on the untargeted placement of Plaintiffs' and the

Class's ads on pop-up, typosquatting, spyware and similar syndication ad sites on which

Plaintiffs and the Class did not agree or intend for their ads to be placed.

73.     The placement of these ads on such sites was (and is) within the exclusive control

of Yahoo.

74.     The placement of these ads on such sites was (and is) extra-contractual because

nothing in the advertising Insertion Orders or the contracts between the parties authorized or

permitted Yahoo to place the ads on untargeted sites. In addition, nothing in the contracts

between the parties reflects the assent or agreement of Plaintiffs and the Class to the placement

of their ads on typosquatting, spyware, pop-up or similar notorious and predatory Internet sites.

26495_1

19

75.     As a matter of public policy, it is unfair and unjust for Yahoo to retain the benefits received, directly and indirectly, from Plaintiffs and the Class in connection with the extra-contractual placement of the ads on nefarious, predatory and untargeted sites.

76.     Plaintiffs and the Class not only suffered the expense of payment for the extra-contractual placement of the ads but also suffered the expense of having their ads associated with infamous, predatory and hated web practices such as typosquatting, spyware and pop-ups.

77.     As a result, it is unfair and unjust for Yahoo to retain the benefits received at the expense of Plaintiffs and the Class when Yahoo had exclusive control over the placement of the ads.

## COUNT III

### (Misrepresentation and Civil Conspiracy)

78.     Plaintiffs hereby incorporate by reference the foregoing allegations as if fully set forth herein.

79.     As noted, Yahoo has misrepresented the nature of the contractual commitment and products it offered and was offering, and has engaged in a "bait and switch" scheme.

80.     In particular, Yahoo's promotional pages and other forms represented Yahoo's advertising products as "highly targeted" when, in fact, Yahoo's Terms and Conditions do not (according to Yahoo) obligate Yahoo to provide such products.  Yahoo has argued in this Court that when it made its "highly targeted" representations, it in fact had no intention to make good on those representations because it did not intend to contractually commit to placing ads only in conformity with the Sponsored Search and Content Match product description.  (Defendants' Reply Brief in support of their motion to dismiss, at 7.)  As a result, Yahoo knowingly misrepresented the nature of its Sponsored Search and Content Match products, as well as its

26495_1

contractual commitment at the time it portrayed the "highly targeted" benefits of its products and contract to Plaintiffs and the Class.

81.    The "highly targeted" representations in connection with Yahoo's Sponsored Search and Content Match products were (and are) objectively material to advertisers, because advertisers pay premium prices for targeted advertising.

82.    Yahoo's promotional pages and Insertion Order forms intentionally omit the material fact that Yahoo (purportedly) was not obligated (and is not obligated) to place an advertiser's ad on anything other than a random basis, or that Yahoo would still charge and collect for ad placements that were untargeted, random and otherwise unproductive (and even detrimental) for the advertisers.

83.    Along with these misrepresentations of material fact, Yahoo also tendered bills to Plaintiffs and the Class that omitted the material fact that ads were placed on random, untargeted and predatory sites and devices for which Plaintiffs and the Class were (purportedly) still obligated to pay.

84.    Similarly, Yahoo's promotional materials and bills knowingly failed to disclose the objectively material fact that Yahoo had syndication agreements with certain Third Party partners that have engaged in (and continue to engage in) nefarious and predatory web practices such as typosquatting, spyware, pop-ups and similar unwanted advertising conduct.

85.    In this respect, Yahoo's syndication partners have conspired to obtain payments from Yahoo's advertising customers through the bait and switch and the placement of ads in spyware and on typosquatting, bulk registration and other Internet back alleys.

86.    The conspiracy Yahoo and its syndication partners perpetrated was designed and implemented in order to maximize ad revenues at the expense of Yahoo's advertising customers.

87.     As a direct result of Yahoo and its syndication partners' conspiracy, Plaintiffs and

the Class paid more to Yahoo for advertising than they would have absent the conspiracy and

absent Yahoo's misrepresentation of material fact.

## COUNT IV

### (Violations of Bus. & Prof. Code § 17200, *et seq.*)

88.     Plaintiffs hereby incorporate by reference the foregoing allegations as if fully set

forth herein.

89.     Plaintiffs bring this cause of action on behalf of themselves, on behalf of the Class

and on behalf of the common or general interest.  Plaintiffs have suffered injury in fact and lost

money as a result of such unfair competition.

90.     Yahoo has engaged in unfair, unlawful and fraudulent business practices as set

forth above and has been unjustly enriched thereby.

91.     By engaging in the above-described acts and practices, Yahoo has committed one

or more acts of unfair competition within the meaning of Bus. & Prof. Code §17200, *et seq.*

92.     Yahoo's acts and practices have and/or are likely to deceive members of the

consuming public.

93.     Yahoo's acts and practices are unlawful because they violate Civ. Code §§1572,

1709 and 1710.  Defendants' acts and practices are also unlawful because they violate Bus. &

Prof. Code §17500, *et seq.*  Yahoo acted with a reckless disregard of Plaintiffs' and the Class's

rights to fair and accurate billing consistent with contractual representations, after Yahoo

represented that it provides advertising placements only in "targeted" and "high quality" web

sites, and after Yahoo represented that it provides advertising consistent with all laws and

regulations.  Yahoo has otherwise acted in an unconscionable way by using deception, unfairness

and lack of good faith involving their advertising placement services. Yahoo's deceptive marketing and sales practices, including affirmative misrepresentations and omissions, were material and substantial and were made in the form of common misrepresentations of material facts upon which persons, including members of the Class, could be expected to rely.

94.     Plaintiffs, on behalf of themselves, on behalf of the Class and on behalf of the common or general interest, seek an order of this Court awarding restitution, disgorgement, injunctive relief and all other relief allowed under §17200, *et seq.*, plus interest, attorneys' fees and costs pursuant to, *inter alia*, C.C.P. §1021.5

95.     Plaintiffs meet the standing requirements of C.C.P. § 382 to bring this cause of action because, among other reasons, the question is one of a common or general interest, is a question that pertains uniformly to many persons and/or the parties are numerous and it is impracticable to bring them all before the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, seek the following relief:

(a)     Certification of this case as a class action, with Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

(b)     Compensatory relief, including disgorgement of Defendants' ill-gotten gains;

(c)     A permanent injunction barring Defendants from engaging in the unlawful practices alleged herein.

(d)     Prejudgment interest;

(e)     Plaintiffs' reasonable attorneys' fees and costs; and

(f)     Such further relief that the Court deems appropriate.

SCANNED

## <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  November 20, 2006                     Respectfully submitted,

**KIESEL BOUCHER LARSON LLP**

By: _____
Paul R. Kiesel, Esq.
8648 Wilshire Boulevard
Beverly Hills, CA 90211
(310) 854-4444

Liaison Counsel for Plaintiffs

**KOHN, SWIFT & GRAF, P.C.**
Michael J. Boni
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

**DONOVAN SEARLES, LLC**
Michael D. Donovan
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
(215) 732-6067

**LAW OFFICES OF BENJAMIN EDELMAN**
Benjamin G. Edelman
27A Linnaean Street
Cambridge, MA 02138
(617) 379-0820

Co-Lead Counsel for Plaintiffs

**SHELLER, LUDWIG & BADEY, P.C.**
Jonathan Shub (SBN 237708)
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300

**GISKAN & SOLOTAROFF**
Oren Giskan
207 W. 25th, 4th Floor
New York, New York 10001
(212) 847.8315

**EDELSON & ASSOCIATES**
Marc Edelson
45 West Court Street
Doylestown, PA 18901
(215) 230-8043

**FELDMAN, SHEPHERD,
WOHLGELERNTER & TANNER**
Alan M. Feldman
Thomas More Marrone
25th Floor, 1845 Walnut Street
Philadelphia, PA 19103
(215) 567-8300

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez
Donna Siegel Moffa
8 Kings Highway West
Haddonfield, NJ 08033
(856) 795-9002

Counsel for Plaintiffs

SCANNED

# PROOF OF SERVICE

STATE OF CALIFORNIA      ) ss:
COUNTY OF LOS ANGELES   )

     I am employed in the City and County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action. My business address is 8648 Wilshire Boulevard, Beverly Hills, California 90211-2910.

     On November 20, 2006, I served the foregoing document(s) described as: **CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT** on the interested parties by placing (   ) the original ( X ) a true and correct copy thereof in a sealed envelope addressed as follows:

## PLEASE SEE ATTACHED SERVICE LIST

☐    VIA OVERNIGHT MAIL:

     VIA : By delivering such documents to an overnight mail service or an authorized courier in an envelope or package designated by the express service courier addressed to the person(s) on whom it is to be served.

☒    VIA U.S. MAIL:

     I am readily familiar with the firm's practice for collection and processing of correspondence for mailing.  Under that practice such envelope(s) would be deposited with the U.S. postal service with postage thereon fully prepaid, at Beverly Hills, California.

☐    VIA PERSONAL DELIVERY:

     I personally delivered such envelope(s) by hand to the offices of the addressee pursuant to CCP § 1011.

☐    VIA FACSIMILE:

     The interested parties receiving the above-referenced document via facsimile have agreed to accept same via facsimile transmission, and the facsimile transmission report indicated that the transmission was complete and without error.  A copy of that report, which was properly issued by the transmitting machine, is attached hereto.

☐    STATE:

     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

☒    FEDERAL:

     I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

26495_1

I declare under penalty of perjury under the laws of the state of California that the above is true and correct and was executed on November 20, 2006, at Beverly Hills, California.

CESAR R. GARCIA

SCANNED

SCANNED

In Re Yahoo Litigation – Service List
United States District Court, Central District of California –
Master File Number: CV-06 2737 CAS (FMOx)

Michael J. Boni, Esq.
KOHN, SWIFT & GRAF P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: 215/238.1700
Co-Counsel for Plaintiffs

Michael D. Donovan, Esq.
DONOVAN SEARLES, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: 215/732.6067
Co-Counsel for Plaintiffs

Benjamin G. Edelman, Esq.
LAW OFFICES OF BENJAMIN
EDELMAN
27A Linnean Street
Cambridge, MA 02138
Telephone: 617/359.3360
Co-Counsel for Plaintiffs

Marc Edelson, Esq.
EDELSON & ASSOCIATES
45 West Court Street
Doylestown, PA 18901
Telephone: 215/230.8043
Co-Counsel for Plaintiffs

Lisa J. Rodriguez, Esq.
Donna Siegel Moffa, Esq.
TRUJILLO, RODRIGUEZ & RICHARDS
LLC
8 Kings Highway West
Haddonfield, NJ 08033
Telephone: 856/795.9002
Co-Counsel for Plaintiffs

Dennis L. Wilson, Esq.
Emil W. Herich, Esq.
KEATS, MCFARLAND & WILSON LLP
9720 Wilshire Boulevard
Penthouse Suite
Beverly Hills, CA 90212
Telephone: 310/248.3830
Counsel for Defendants

Jonathan Shub, Esq.
SHELLER, LUDWIG & BADEY P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
Telephone: 215/790.7300
Co-Counsel for Plaintiffs

Oren Giskan, Esq.
GISKAN & SOLOTAROFF
207 West 25th, 4th Floor
New York, New York 10001
Telephone: 212/847.8315
Co-Counsel for Plaintiffs

Alan M. Feldman, Esq.
Thomas More Marrone, Esq.
FELDMAN, SHEPHERD,
WOHLGELERNTER & TANNER
25th Floor, 1845 Walnut Street
Philadelphia, PA 19103
Telephone: 215/567.8300
Co-Counsel for Plaintiffs