1　Paul R. Keisel, Esq. (CBN 119854)
2　KIESEL BOUCHER LARSON LLP
　　8648 Wilshire Boulevard
3　Beverly Hills, California 90211
4　Telephone: 310/854.4444
　　Facsimile: 310/854.0812
5

6　**Attorneys for Plaintiffs**
7　**Additional Counsel Appear on Signature Page**

8　　　　　UNITED STATES DISTRICT COURT
9　　　　CENTRAL DISTRICT OF CALIFORNIA
10　　　　　　　WESTERN DIVISION
11

12　IN RE YAHOO! LITIGATION　　│　Case No.: CV-06-2737 CAS (FMOx)

13　　　　　　　　　　　　　　　│　**MEMORANDUM IN SUPPORT OF**
14　　　　　　　　　　　　　　　│　**PLAINTIFFS' MOTION FOR**
　　　　　　　　　　　　　　　　│　**CLASS CERTIFICATION**
15
16　　　　　　　　　　　　　　　│　Date:　　November 10, 2008
　　　　　　　　　　　　　　　　│　Time:　　10:00 a.m.
17　　　　　　　　　　　　　　　│　Courtroom: 5
18　　　　　　　　　　　　　　　│　Honorable Christina A. Snyder, presiding
19

20
21　　　　　Plaintiffs file this brief in support of their Motion for Class Certification.
22　As argued below, the proposed class readily meets the standards for class
23　certification articulated in *Federal Rule of Civil Procedure* 23.　Accordingly,
24　Plaintiffs' Motion for Class Certification should be granted.
25　/ / /
26　/ / /
27　/ / /
28　/ / /

# **TABLE OF CONTENTS**

**Page No(s)**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

III.  CLASS CERTIFICATION IS WARRANTED UNDER RULE 23 . . . . . .    10

    A.    Standards for Class Certification . . . . . . . . . . . . . . . . . . . . . . . . .    10

    B.    The Requirements of Rule 23(a)(1)-(4) are Met . . . . . . . . . . . . . . .    12

        1.    Numerosity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

        2.    Commonality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

        3.    Typicality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

        4.    Adequacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

    C.    The Requirements of Rule 23(b) are Met . . . . . . . . . . . . . . . . . . .    17

        1.    Common Questions of Law and Fact Predominate. . . . . . . . . .    18

        2.    Class Treatment is the Superior Method to Resolve
           This Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

# **TABLE OF AUTHORITIES**

## **Federal Cases**

*Armstrong v. Davis*
275 F.3d 849, 868 (9th Cir. 2001), cert. den., 537 U.S. 812 (2002) . . . . . . . . . . . 13

*Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*
2006 WL 3371690, at *20-*22 (D.N.J. Nov, 17, 2006) . . . . . . . . . . . . . . . . . 21, 22

*Blackie v. Barrack*
524 F.2d 891, 901 n.17 (9th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Bolanos v. Norwegian Cruise Lines Ltd.*
212 F.R.D. 144, 148 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Deposit Guaranty Nat'l Bank v. Roper*
445 U.S. 326, 338 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dukes v. Wal-Mart*
509 F.3d 1168, 1177 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14, 15

*Dura-Built Corp. v. Chase Manhattan Corp.*
89 F.R.D. 87, 93 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Eisen v. Carlisle & Jacquelin*
417 U.S. 156, 186, n.8 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Esplin v. Hirschi*
402 F.2d 94, 101 (10th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Evans v. City of Chicago*
522 F. Supp. 789, 806 (N.D. Ill. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*General Tel. Co. of Southwest v. Falcon*
457 U.S. 147, 157 n.13 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gulf Oil Co. v. Bernard*
        452 U.S. 89, 99 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Hanlon v. Chrysler Corp.*
150 F.3d 1011, 1019 (9th Cir.1998) . . . . . . . . . . . . . . . . . 13, 15, 16, 18, 23, 24

*Hydrite Chem. Co. v. Calumet Lubricants Co.*
47 F.3d 887, 890-91 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Visa Check/MasterMoney Antitrust Litig.*
280 F.3d 124, 139 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kelley v. Microsoft Corp.*
Civil Action No. 07-475, 2008 WL 509332
(W.D. Wash. Feb. 22, 2008) . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 19, 20, 21

*In re NASDAQ Market-Makers Antitrust Litig.*
169 F.R.D. 493, 509 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*L.H. v. Schwarzenegger*
2007 U.S. Dist. LEXIS 18728, *27 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . 12

*Lozano v. AT & T Wireless Services, Inc.*
504 F.3d 718, 736 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Mortimore v. F.D.I.C.*
197 F.R.D. 432, 438 (W.D.Wash. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Professional Adjusting Systems, Inc. v. General Adjustment Bureau, Inc.*
64 F.R.D. 35, 38 (S.D.N.Y. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Rog v. Professional Window & House Cleaning, Inc.
No. 84-4198, 1985 U.S. Dist. LEXIS 18551,
*4-*5 (N.D. Ill. June 25, 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Swack v. Credit Suisse First Boston*
230 F.R.D. 250, 259 (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Walters v. Reno*
145 F.3d 1032, 1046 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Westways World Travel, Inc. v. AMR Corp.*
218 F.R.D. 223, 234 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Zinser v. Accufix Research Inst., Inc.*
253 F.3d 1180, 1186 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

### State Cases

*McCarty v. Beach*
10 Cal 461, 464 (Cal. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Midland Pacific Building Corp. v. King*
157 Cal. App. 4th 264, 275 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sweet v. Johnson*
169 Cal. App. 2d 630, 632, 337 P.2d 499 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

### Satutes

California Civil Code § 3360 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Federal Rules of Civil Procedure, Rule 23   1, 2, 10, 11, 12, 13, 14, 15, 16, 17, 23, 24

**Other**

1 H. Newberg & A. Conte, NEWBERG ON CLASS ACTIONS
§ 3:5 (4th ed. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

3 NEWBERG ON CLASS ACTIONS
§ 7:24 (4th Ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## I.   INTRODUCTION

This case challenges the unlawful practices of Defendant search engine operators, Yahoo and Overture (collectively "Yahoo"), for which Plaintiffs seek damages on behalf of themselves and thousands of others harmed by Yahoo's practices.  The case should be certified as a class action, as the matter meets all of the requirements of Rule 23 of the *Federal Rules of Civil Procedure*.

Based upon the allegations of the Second Amended Class Action Complaint, and discovery to follow the submission of this motion, Plaintiffs propose a class (the "Class") consisting of the following:

> **All persons or entities that contracted with one or more Defendants for Sponsored Search or Content Match advertising placement services at any time on or after May 1, 2000.**

Because Defendants' practices were consistent with respect to every class member, including imposing on them a uniform, unilaterally drafted contract and publishing website promotions and other representations, because establishing defendants' liability and damages will be accomplished with common proof, because the common issues in this case predominate over any individual issues that may arise, and because all other requirements under Rule 23 are met, the Court should certify the Class.

## II.   STATEMENT OF FACTS

Defendant Yahoo is one of the largest search engines on the Internet.  Its business consists of operating a number of web sites and showing ads on those web sites, as well as providing ads to be shown by its various partners.  Yahoo's revenues in 2005 were $5.3 billion.  Defendant Overture, a wholly owned subsidiary of Yahoo, provides technology and systems for showing, tracking, and charging for search advertisements.  The Class consists of entities that advertise on the Internet, and that pay Yahoo to place ads on web sites that attract persons who

1  might be interested in the advertised goods or services.  (Consolidated Amended

2  Class Action Complaint ("Compl.")  ¶¶ 20-22.)

3  Whether a business advertises on TV, in a newspaper, or on the Internet, the

4  business strives to maximize the return on its advertising investment by displaying

5  the ad in front of persons interested in the product.  Advertisers such as Budweiser

6  and Ford pay premium prices for targeted ad placement during televised NFL

7  football games.  Just as traditional advertising costs more in some publications or

8  TV networks than others, so too do the prices of Internet advertising vary.  The

9  market value of Internet ads is higher when the ads are shown to users who are, for

10  example, actively seeking certain products or actively engaged in purchasing

11  decisions for such products.  (*Id.* ¶¶ 3, 23.)

12  Advertisers buy ads from Yahoo, at Yahoo's high prices, because Yahoo

13  purports to offer high-quality sites with high-quality users.  Yahoo specifically

14  touts the quality of its sites and the third party sites at which Yahoo displays ads:

15  Yahoo describes those third party sites as "popular [and] high-quality,"

16  specifically naming such distinguished partners as Microsoft, CNN, and the Wall

17  Street Journal.  *See* http://searchmarketing.yahoo.com/rc/srch/srch.php.  Yahoo

18  represents to its advertising customers that its ads are only shown to users who

19  have shown interest in corresponding products or services (*e.g.*, by conducting a

20  related search).  Yahoo promises that advertisers' ads will be "highly targeted" to

21  such users.  *See* http://searchmarketing.yahoo.com/rc/srch/srch.php.  (Compl. ¶¶

22  23-24.)

23  In fact, the very names Yahoo has given to its two targeted advertising

24  products, "Sponsored Search" and "Content Match," suggest on their face that

25  those products provide targeted ad delivery.  Although Yahoo's contract -- a

26  uniform, boilerplate set of terms and conditions unilaterally imposed by Yahoo on

27  its advertising customers -- does not define the terms "Sponsored Search" and

28  "Content Match," Yahoo readily and prominently promotes those products on its

web site as targeted ad placement products.  Yahoo states that Sponsored Search advertising displays ads at search engines, to reach "search users" who are actively engaged in searching the web; and that "Content Match" advertising displays ads at content sites, showing ads "along with relevant articles, product reviews, and more."  *See* http://searchmarketing.yahoo.com/rc/srch/srch.php; http://searchmarketing.yahoo.com/rc/srch/eworkbook.pdf, page 98.  (Compl. ¶¶ 23, 25.)

Defendants represented that advertisement displays will be "highly targeted."  *See* http://searchmarketing.yahoo.com/rc/srch/srch.php.  Defendants represented that ads would be shown to users "searching for what you sell."  *See* http://searchmarketing.yahoo.com/rc/srch/eworkbook.pdf P.5.  Defendants represented that "a listing for your business will appear when Internet users enter searches related to your keywords."  *Id.* at 18.  Defendants further represented that "relevant listings are displayed to interested users."  *Id.* at 7.  Defendants thereby promised only to show class members' ads when the ads are actually relevant to users' interests, as revealed through users' search terms or web browsing.  (Compl. ¶ 26.)

Contrary to Defendants' contractual obligations, Defendants' relationships with spyware vendors, untargeted placement providers, and others have caused class members' ads to appear without any targeting whatever.  In those circumstances, advertisers pay for untargeted traffic that is worth far less than what Defendants charge, and far less than class members agreed to pay under the mis-portrayal that traffic would all be targeted.  (*Id.* ¶ 27.)

Furthermore, Defendants fail to disclose the material fact that Plaintiffs' and the Class's ads are displayed on an untargeted basis, as well as on a targeted basis, that "sponsored search" ads appear even when users are not conducting searches at all, and that "content match" ads are displayed in pages containing nothing but

/ / /

1  ads, without anything whatever to "match," among other material omissions.  (*Id.*
2  ¶ 28.)

3      Defendants' own statements reveal the high value of targeted traffic and,
4  conversely, the lower value of untargeted traffic.  Defendants specifically tout the
5  benefits of targeting.  "Search results are a powerful way for customers to find
6  your web site, because users *are actively looking* for the products or services you
7  offer."  *See* http://us.i1.yimg.com/us.yimg.com/i/us/cn/srch/hssw.swf (emphasis
8  added).  Defendants further claim that targeted ads are "a powerful way to connect
9  with customers who are searching for what you sell."  *Id.*  (Compl. ¶ 29.)

10      However, Plaintiffs' and the other class members' ads are often placed in
11  locations on the Internet that have nothing to do with "sponsored searches" or
12  "content matches."  Without Plaintiffs' and the Class's authorization, Yahoo
13  shows advertisers' ads in contexts that the advertisers never agreed or wanted to be
14  associated with, including illegal spyware, pop-ups and typosquatting sites.  (*Id.* ¶
15  30.)

16      Yahoo knowingly has manipulated that system for its own benefit, by
17  increasing the volume of improper advertising displays during financial reporting
18  periods when Yahoo was at risk of failing to meet investor expectations.  Set forth
19  below is a description of some of Yahoo's unlawful practices in connection with
20  its placement of Plaintiffs' and the Class's ads.  (*Id.* ¶¶ 31-32.)

21      **Spyware.**  The term "spyware" refers to a broad class of unwanted software
22  programs installed on users' computers, either without their consent or without
23  their informed consent, that take actions averse to the users' interests such as, for
24  example, causing unwanted and annoying pop up ads, transmitting personal
25  information about the user, and slowing the user's computer.  Many such
26  programs earn revenues by showing advertising, especially via pop-up ads.
27  Spyware has become a serious problem for Internet users.  It is estimated that
28  spyware infects at least half of all Internet-connected computers.  Further, spyware

1    reportedly is the subject of more than 20% of all tech support calls to Dell (a

2    leading computer manufacturer), and reportedly causes more than half of all

3    Windows crashes. (*Id.* ¶ 33.)

4        Installing spyware on users' computers without users' consent entails

5    committing trespass to chattels as well as computer tampering.  Installing spyware

6    on users' computers without informed consent also violates state consumer

7    protection statutes, and constitutes false advertising and other deceptive business

8    practices. (*Id.* ¶ 34.)

9        Advertisers want no part of spyware-delivered advertising.  Staff of the U.S.

10   Federal Trade Commission ("FTC") and New York Attorney General's office

11   have repeatedly instructed advertisers to be wary of spyware-delivered advertising.

12   Furthermore, advertisers recognize spyware for the scourge that it is, and they

13   therefore seek to keep their ads out of spyware. (*Id.* ¶ 35.)

14       Yahoo! Publisher Network Policies specifically provide that Yahoo's

15   Syndication Partners must not show ads in pop-ups or pop-unders (advertising

16   methods widely associated with spyware). *See*

17   https://publisher.yahoo.com/legal/prog_policy.php.  Defendants describe pop-up

18   ads as "the current bane of web surfers." *See*

19   http://searchmarketing.yahoo.com/rc/srch/htgla_dp.php.  Yahoo's statements

20   convey that it will not use, nor pay Syndication Partners to use or provide, such

21   unwanted and improper forms of advertising. (Compl. ¶ 36.)

22       In fact, Yahoo has caused class members' ads to appear in spyware software

23   programs.  In 2005 and 2006, New York Attorney General's office investigations

24   of spyware operators Intermix and Direct Revenue revealed that Yahoo has placed

25   class members' ads into spyware provided by those companies.  Other

26   investigations have uncovered numerous other instances of Yahoo placing class

27   members' ads into notorious and well-known spyware. (*Id.* ¶ 37.)

28   / / /

1   Yahoo's use of spyware is illegal.  Yahoo has caused class members' ads to

2   appear in spyware-delivered windows without the labeling and disclosures

3   required by applicable regulations.  In 2002, the FTC issued labeling requirements

4   for search engine advertising.  In violation of those rules, Yahoo has established

5   relationships with spyware vendors that lack such labeling, causing class

6   members' ads to be shown in violation of specific FTC instructions.  (*Id.* ¶ 38.)

7   By placing class members' ads into illegal platforms such as spyware

8   programs, Yahoo wrongfully collects high search engine advertising fees for ads

9   that are actually shown in contexts that are worth far less, if anything.  It is well

10   known that spyware advertising is much cheaper than search engine advertising.

11   *See* http://www.mygeek.com/public/faq.jsp#cam02 and

12   http://www.metricsdirect.com/whatwedo/youradvertisingbudget.aspx (reporting

13   prices of $0.03 or lower for spyware-delivered advertising – more than an order of

14   magnitude lower than Yahoo's prices).  But when Yahoo and its Syndication

15   Partners place class members' ads into spyware, it continues to charge class

16   members full price for these ads, pocketing the difference between the high fees

17   class members pay and the low cost of providing spyware-delivered advertising.

18   (Compl. ¶ 27.)

19   **Typosquatting.**  Yahoo also caused class members' ads to appear within

20   "typosquatting" web sites.  Typosquatters register domain names, or web

21   addresses, that are identical or confusingly similar to the names of well-known

22   companies, products, and trademarks, for example "washingtopnost.com" or

23   "cartoonnetworik.com."  If a user mistypes a domain, the user may end up at a

24   typosquatting site and, due to Yahoo's relationships with such sites, may see class

25   members' ads on such sites.  (*Id.* ¶ 40.)

26   Typosquatting sites are illegal under the Anti-Cybersquatting Consumer

27   Protection Act ("ACPA"), which prohibits registration and use of domain names

28   that are "identical or confusingly similar" to a trademark.  15 U.S.C. §

1125(d)(1)(A)(ii)(II).  Nonetheless, Yahoo has established relationships with typosquatting web sites, and has charged class members fees for showing their ads in such web sites.  (Compl. ¶ 41.)

Yahoo represents that its "Sponsored Search" product reaches "active users *on top search engines.*"  *See* http://searchmarketing.yahoo.com/index.php (emphasis added).  Yahoo further represents that ads are shown "in search results on the web's top portals and search engines."  *See* http://us.i1.yimg.com/us.yimg.com/i/us/cn/srch/hssw.swf.  However, users who have merely mistyped a web address are not "on" any search engine at all, let alone a "top" search engine.  (Compl. ¶ 42.)

Yahoo's use of typosquatting sites violates their contract with Plaintiffs and the Class – because such ad placement is neither Sponsored Search nor Content Match – and violates both settled trademark law and the ACPA.  (*Id.* ¶ 43.)

Yahoo even charges its advertising customers for ads shown on typosquatting web sites targeting ***those customers' own names***.  Take for example Yahoo's advertising customer Expedia.com.  A user intending to visit the Expedia web site might mistype it as "expedai.com."  At "expedai.com," the user sees a list of ads provided by Yahoo, including an ad for Expedia, along with other customers of Yahoo.  If the user clicks the Expedia ad, the user is taken to the true Expedia site, which is where he or she wanted to go in the first place.  But as a result of Yahoo's relationship with the typosquatter, Expedia had to pay Yahoo an advertising fee.  (*Id.* ¶ 44.)

**"Parking" and Bulk Registration Sites.**  Yahoo has also caused class members' ads to appear within "parking" and other bulk registration sites.  These sites appear if users incorrectly guess, mis-remember or otherwise mistype a domain name.  Yahoo shows class members' ads on such untargeted sites, and charges class members its usual premium prices.  But class members did not
/ / /

1   contract to buy advertising at such sites, because they are not part of the Sponsored

2   Search or Content Match products that Plaintiffs bargained for.  (*Id.* ¶ 45.)

3   **Resulting Harms.**  Class members pay Yahoo a premium price for the

4   Sponsored Search and Content Match advertising placements for which they

5   bargained, and which Yahoo promised to provide.  However, in addition to some

6   ad placement through Sponsored Search and Content Match, Yahoo also placed

7   ads within spyware programs, typosquatting sites, and other untargeted sites

8   maintained by their Syndication Partners[1] where market prices are far less.  *See*

9   http://www.metricsdirect.com/whatwedo/youradvertisingbudget.aspx (reporting

10  prices of $0.03 or lower for spyware-delivered advertising).  *See*

11  http://www.mygeek.com/public/faq.jsp#cam02 (reporting prices of $0.008 to

12  $0.03 for spyware-delivered advertising).  Yahoo and its partners pocket the

13  difference, causing class members to incur un-bargained for payments to Yahoo.

14  (Compl. ¶ 46.)

15  As a result of Yahoo's unlawful conduct, Plaintiffs and the Class assert

16  claims for common law breach of contract, unjust enrichment, misrepresentation

17  and civil conspiracy and for statutory violations under the Unfair Competition Law

18  ("UCL" or "Section 17200"), *Business and Professions Code* § 17200 *et seq.*

19  Plaintiffs seek actual and/or compensatory damages; restitution; equitable relief,

20  costs and expenses of litigation, including attorneys' fees; and all additional and

21  further relief that may be available.  (*Id.* ¶ 11.)

22  / / /

23  / / /

24  _____

25  [1]     Yahoo pays a variety of Syndication Partners to display Sponsored Search

26  and Content Match ads.  When a user clicks one of these ads, Yahoo charges the

27  advertiser, then passes a portion of the advertiser's payment on to the Syndication
    Partner.  In some instances, a Yahoo Syndication Partner has further subpartners

28  of its own.  When a user clicks such an ad, Yahoo pays the Syndication Partner,
    which in turn pays the subpartner.

### III.   CLASS CERTIFICATION IS WARRANTED UNDER RULE 23

The class action is one of the few legal remedies the small claimant has against those who command the status quo.... The matter touches on the issue of the credibility of our judicial system. Either we are committed to make reasonable efforts to provide a forum for adjudication of disputes involving all of our citizens...or we are not. There are those who will not ignore the irony of courts ready to imprison a man who steals some goods in interstate commerce while unwilling to grant a civil remedy against the corporation which has benefited, to the extent of many millions of dollars, from collusive, illegal pricing of its goods....When the organization of a modern society, such as ours, affords the possibility of illegal behavior accompanied by widespread, diffuse consequences, some procedural means must exist to remedy – or at least to deter – that conduct.

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 186, n.8 (1974) (Douglas, J., joined by Brennan, and Marshall, JJ., concurring).

Plaintiffs seek to certify a class (the "Class") of the following:

> **All persons and entities that contracted with one or more Defendants for Sponsored Search or Content Match advertising placement services at any time on or after May 1, 2000.**

The legal and factual issues that will control resolution of this case for all Class members are straightforward and support certification of the Class. This Court should find that the allegations against Yahoo – involving breach of contract, unjust enrichment, misrepresentation, and violations of California business law premised on Yahoo's deceptive sale and placement of supposedly targeted advertisements on unwanted random websites – raise predominating common questions that can and should be resolved in a class action.

### A.   Standards for Class Certification

"Class actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981). The Supreme Court has recognized that the class action procedure is necessary for private rights of action

to be initiated. *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 338 (1980). Class actions permit plaintiffs to "vindicat[e] the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost." *Id*. In other words, class actions provide access to justice for diffuse but meritorious claims that might be uneconomical or impractical to pursue otherwise.

In determining whether to certify claims for class-wide treatment, courts should focus on the requirements of Rule 23 and not on the merits of the claim. *See Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 177-78 (1974). The determinations called for by the Rule are addressed to the sound discretion of the district court. *Gulf Oil Co.*, 452 U.S. at 100. In exercising this discretion, the court should conduct a "rigorous analysis" and generally is bound to accept the substantive allegations of the Complaint "as true" unless there is evidence that the defendant's policies, practices or conduct were idiosyncratic, variable or claimant-specific. *See Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976). As the Ninth Circuit recently reiterated, "courts are not only at liberty to but must consider evidence which goes to the requirements of Rule 23 [at the class certification stage] even [if] the evidence may also relate to the underlying merits of the case." *Dukes v. Wal-Mart*, 509 F.3d 1168, 1177 (9th Cir. 2007).

There is no doubt that the class proponent bears the burden of proof with respect to the class certification elements. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). However, where, as here, merits and class discovery have not been completed, that burden is not a heavy one. *See Kelley v. Microsoft Corp.*, Civil Action No. 07-475, 2008 WL 509332 (W.D. Wash. Feb. 22, 2008) (certifying class of purchasers of "Home Basic" system allegedly portrayed as "Vista-capable"). "[T]he choice for a district court must be somewhere between the pleadings and the fruits of discovery." *Professional*

1  *Adjusting Systems, Inc. v. General Adjustment Bureau, Inc.*, 64 F.R.D. 35, 38

2  (S.D.N.Y. 1974).  The courts have recognized repeatedly that because a district

3  court can revisit class certification at any time, close calls should be resolved in

4  favor of certification.  *See Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968) ("in

5  a doubtful case . . . any error should be committed in favor of allowing the class

6  action").  The focus, however, is and should remain on the question whether, as a

7  practical matter, a common cause of liability is susceptible to generalized proof for

8  all or nearly all class members.  *See Dukes*, 509 F.3d at 1177; *Kelley v. Microsoft*

9  *Corp.*, 2008 WL 509332 at *11.

10  **B.**   **The Requirements of Rule 23(a)(1)-(4) are Met**

11     **1.**   **Numerosity**

12     Rule 23(a)(1) requires that the class be "so numerous that joinder of all

13  members is impracticable."  The Rule does not set out a precise numerical

14  standard, but focuses instead on common sense practicalities.  *See* 1 H. Newberg

15  & A. Conte, NEWBERG ON CLASS ACTIONS, § 3:5 (4th ed. 2003).  Plaintiffs need

16  not state the exact number of class members, so long as the estimated number is

17  large enough to show that individual participation would not be logistically or

18  economically feasible.  *See Dukes,* 509 F.3d at1177 (numerosity conceded where

19  both parties estimate class of over 1.5 million people); *L.H. v. Schwarzenegger*,

20  2007 U.S. Dist. LEXIS 18728, *27 (E.D. Cal. 2007).  This is particularly true

21  where the information regarding the number of individuals affected by the alleged

22  wrongful conduct is within the defendant's control.  *Westways World Travel, Inc.*

23  *v. AMR Corp.*, 218 F.R.D. 223, 234 (C.D. Cal. 2003) (quoting *In re NASDAQ*

24  *Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996)).  Moreover,

25  where, as here, the defendant's conduct is widespread and diffuse, "the difficulty

26  that the size of the potential class poses for joinder is exacerbated by the

27  geographical diversity of the class members, who are likely dispersed throughout

28  / / /

1 the country." *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 259 (D. Mass.
2 2005).

3       The Class Plaintiffs seek to represent is ascertainable and includes
4 thousands of businesses and individuals throughout California and the country.
5 The Class consists of tens of thousands of advertisers. These Class members are
6 geographically dispersed throughout the United States, as Yahoo's internet
7 advertising service is, by its very nature, global in scope. While Plaintiffs have not
8 yet determined the exact number of Class members, Yahoo's records will reveal a
9 readily ascertainable number who, like the named Plaintiffs, paid Yahoo for
10 sponsored search and content match but received and paid for randomly displayed
11 ads through spyware, adware and other un-contracted for displays. Accordingly,
12 the Class is so numerous that joinder would be impracticable.

13              **2.    Commonality**

14       Rule 23(a)(2) requires that there be questions of law *or* fact common to all
15 class members. The commonality requirement is met if "plaintiffs' grievances
16 share a common question of law or of fact." *Armstrong v. Davis*, 275 F.3d 849,
17 868 (9th Cir. 2001), *cert. den.*, 537 U.S. 812 (2002). "To assess commonality,
18 the focus is on the defendant's *liability*, not the extent of the liability. Therefore,
19 the court may separate the issue of liability from that of damages. Differences in
20 the amount of damages sought will not destroy commonality." *Rog v.*
21 *Professional Window & House Cleaning, Inc.*, No. 84-4198, 1985 U.S. Dist.
22 LEXIS 18551, *4-*5 (N.D. Ill. June 25, 1985)(emphasis in original)(citing *Evans*
23 *v. City of Chicago*, 522 F. Supp. 789, 806 (N.D. Ill. 1980)). *In* the Ninth Circuit,
24 "Rule 23(a)(2) has been construed permissively. All questions of fact and law
25 need not be common to satisfy the rule. The existence of shared legal issues with
26 divergent factual predicates is sufficient, as is a common core of salient facts
27 coupled with disparate legal remedies within the class." *Hanlon v. Chrysler*
28 *Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998). Importantly, "[t]he commonality test

is qualitative rather than quantitative – one significant issue common to the class may be sufficient to warrant class certification." *Dukes*, 509 F.3d at 1177.

In this case, Plaintiffs have alleged at least the following common issues:

1.    Whether Yahoo breached its contract by promising and charging for, but failing to deliver, Sponsored Search and Content Match advertising;

2.    Whether Yahoo was unjustly enriched by charging and collecting for ad placements Plaintiffs and the Class did not order, target or authorize;

3.    Whether Yahoo misrepresented or omitted material facts and conspired with its syndication partners to artificially inflate revenues at the Class's expense;

4.    The appropriate remedies for Yahoo's unlawful practices; and

5.    Whether Yahoo should be enjoined from continuing its unlawful practices.

Any one of these common questions of law or fact is sufficient to establish commonality in this action.

Moreover, class claims based on uniform disclosures made by a defendant to all its customers are sufficient to establish the commonality prong of Rule 23(a). *Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718, 736 (9th Cir. 2007). The law is well settled that cases that involve allegations arising from form contracts or documents are "particularly appropriate" for treatment as a class action. *Mortimore v. F.D.I.C.*, 197 F.R.D. 432, 438 (W.D.Wash. 2000). Here, Yahoo made the same disclosures about ad placement and offered the same promises for targeted placement to each class member. *See* Declaration of Benjamin Edelman ("Edelman Dec."), Exhibit A-D (screen shots). Additionally, Yahoo utilized a single electronic form contract for each transaction with members of the proposed class. *See* Edelman Dec. Exhibit A (screen shot of form contract).

1    For these reasons, Plaintiffs have satisfied the commonality requirement.

2    ### 3.    Typicality

3    Rule 23(a)(3) requires that the claims of the representative plaintiff be

4    typical of those of the class.  Commonality and typicality "tend to merge," such

5    that factors that support a finding of commonality also support a finding of

6    typicality.  *See General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13

7    (1982).  "A claim is typical if it arises from the same event or practice or course

8    of conduct that gives rise to the class members' claims and the representative's

9    claims are based on the same legal theory."  *Rog*, 1985 U.S. Dist. LEXIS 18551

10   at *6.  Typicality refers to the nature of the claim, not the specific facts from

11   which it arose or to the relief sought.  *Id.*  "'Under the rule's permissive

12   standards, representative claims are 'typical' if they are reasonably coextensive

13   with those of absent class members; they need not be substantially identical.'"

14   *Dukes,* 509 F.3d at 1184 (quoting *Hanlon*, 150 F.3d at 1020).

15   Here, Plaintiffs' claims are typical of the Class they seek to represent.

16   Plaintiffs all contracted for "Sponsored Search" and "Content Match" services,

17   paying higher prices for such targeted advertising than they would have paid for

18   generic, randomly displayed advertising.  Every member of the Class also

19   contracted for "Sponsored Search" or "Content Match" displays while Yahoo

20   unilaterally provided non-targeted advertising displays that were not, in fact, a

21   result of a "sponsored search" or a "content match."  Plaintiffs and each Class

22   member, in turn, paid more for the advertising because of the same undisclosed

23   policy, practice and course of conduct by Yahoo – extra-contractual ad

24   placements that were not targeted as represented by the "Sponsored Search" and

25   "Content Match" promises.  Thus, proof of Plaintiffs' claim that Yahoo breached

26   its contract by providing and charging for un-contracted advertising displays is

27   "reasonably coextensive with those of absent class members," *Dukes*, 509 F.3d at

28   1184, and, therefore, Plaintiffs' claims are typical.

Indeed, Plaintiffs' claims present virtually identical fact patterns and legal theories that every Class member would have to present if he or she filed an individual suit.  Each Class member, like Plaintiffs, would also have to show what Yahoo promised, whether that promise included untargeted advertising displays, and whether advertising displays that were not the result of a "Sponsored Search" or a "Content Match" constitute a breach of contract.  Each class member, like Plaintiffs, would likewise have to show that the price they paid for ostensibly "targeted" advertising was inflated from the price that would have prevailed had Yahoo disclosed that it and its partners would display ads in untargeted placements such as spyware, adware, typo-squatting, domain parking and other random displays.  Hence, Plaintiffs' claims are not just typical, they are also completely coextensive with the claims of each Class member.

### 4.   **Adequacy**

The fourth and final Rule 23(a) requirement – adequacy – requires: (1) that the class representative and class counsel not have conflicts-of-interest with the class and (2) that the class be represented by qualified counsel who will vigorously prosecute the case on behalf of the class.  *Hanlon*, 150 F.3d at 1020. Factual differences in the merits of the named plaintiff's underlying claims do not necessarily affect the plaintiff's ability to vigorously represent the class.  *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1997).  The requirement of adequate representation is not a search for a perfect plaintiff with an unassailable claim. The requirement merely assures that absent class members, who will be bound by the result, are protected by a vigorous and competent prosecution of the case by someone who shares their interests.  *See* 1 NEWBERG ON CLASS ACTIONS, § 3:21 (4th ed. 2004).

Here, Plaintiffs and their counsel have no conflicts of interest with the other Class members.  Rather, Plaintiffs share the same interest as absent Class members in establishing Yahoo's breach of contract and deceptive conduct.

Additionally, Plaintiffs and the Class are represented by competent and experienced counsel who have represented numerous classes in actions involving breach of contract, fraud and other legal violations.  Generally, until the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession and the presumption fairly arises that all members of the bar in good standing are competent.  3 NEWBERG ON CLASS ACTIONS, § 7:24 (4th Ed. 2002)).  As set forth in the Boni Dec., Plaintiff's counsel have solid reputations for excellence in class litigation.  Paul R. Kiesel has litigated dozens of class actions, including cases in this Court.  Similarly, Michael J. Boni has served as class counsel in more than fifty class actions throughout the country.  Benjamin Edelman has provided technical expert analyses in many cases involving the Internet, and is an authority in the field of Internet practices.  Likewise, Michael D. Donovan has substantial experience in class action litigation, having tried to verdict two class actions in the last three years.  A detailed description of counsel's experience is appended to the Boni Dec. as Exhibits A-D.

For the foregoing reasons, the class representatives and class counsel are more than adequate to protect the interests of the Class in this case.

## C.   The Requirements of Rule 23(b) are Met

Once the proposed class establishes that the Rule 23(a) requirements are satisfied, the class only need establish that one of the Rule 23(b) requirements is present.  In this case, Plaintiffs move for certification pursuant to Rule 23(b)(3).  Rule 23(b)(3) provides that the court should certify a class if it finds that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Fed. R. Civ. P.* 23(b)(3).

Rule 23(b)(3) requires the court to perform a two-stage analysis.  First, whether common questions of fact or law predominate over individual issues.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Second, whether a class action is superior to other available methods for a fair and efficient adjudication of the controversy. *Hanlon*, 150 F.3d at 1022.

In this case, the complaint alleges the common fact that all class members were subject to the same form contract. (Compl. ¶ 58.) In return for placing an ad with Yahoo, Yahoo provided that it would "deliver[ ] highly targeted customer leads to your business by allowing you to control placement within sponsored search results across the Web." (*Id.* ¶ 59.) Pursuant to the contracts, Defendants enabled Plaintiffs to "[l]ist your business in sponsored search results across the Web." Defendants' two product offerings, "Sponsored Search" and "Content Match," would purportedly provide businesses an additional web presence by "extend[ing] your reach beyond sponsored results by displaying your listings alongside relevant articles, product reviews and more." *Id.*

But Yahoo did not make good on its promise. Yahoo did not exclusively provide Sponsored Search or Content Match, as its contracts promised it would do. To the contrary, it also provided completely untargeted ad placements that had nothing at all to do with the users' searches, it placed ads with spyware and typo-squatting partners, and it placed ads on domain parking and bulk registration sites. Under any definition of the terms "Sponsored Search" and "Content Match," Yahoo failed in every instance to provide its advertising customers with either of those products. By not disclosing the policy, practice and course of conduct of placing ads through extra-contractual, untargeted means, Yahoo was able to charge a higher, inflated price for each ad, because the purportedly targeted advertising was more desirable than the untargeted, which is a common, market question for the whole advertising class.

### 1. **Common Questions of Law and Fact Predominate.**

Several predominating common questions of law or fact arise in this case, including whether Yahoo's uniform, web-published representations -- that its ad placement services are "highly targeted" and involve only "high quality" websites

1   -- are false and misleading; whether Yahoo was unjustly enriched by charging and

2   collecting for ad placements Plaintiffs and the class did not order, target or

3   authorize; whether Yahoo conspired with its syndication partners to artificially

4   inflate revenues at the Class's expense; whether a common methodology exists for

5   determining the amount of damages owed to the class; and whether injunctive

6   relief should be imposed on Yahoo.  In addition to this multitude of common

7   questions, one central question alone predominates over any individual issue that

8   may arise in this case:  whether Yahoo breached its contract with Class members

9   by violating the terms of its own, unilaterally drafted form contract by failing

10  exclusively to provide either of its two promised ad placement services, Sponsored

11  Search and Content Match.  Related to this question is the issue of whether

12  Yahoo's charges for ad placements were inflated due to Yahoo's failure to disclose

13  the material fact that it would place ads randomly through its partners without any

14  Sponsored Search or Content Match.

15      Established class action case law makes clear that these central questions

16  common to all Class members satisfy the elements of predominance and

17  superiority, and therefore class certification is proper.  For example, the facts and

18  claims of the proposed Class are quite similar to those of a class of plaintiffs

19  recently certified within the Ninth Circuit in *Kelley v. Microsoft Corp.*, Civil

20  Action No. 07-475, 2008 WL 509332 (W.D. Wash. Feb. 22, 2008) (certifying

21  class of purchasers of "Home Basic" system allegedly portrayed as "Vista-

22  capable") ("*Microsoft*").  A central allegation of the certified class in *Microsoft*

23  was that the class members paid a higher price for computers that purportedly had

24  the ability to work with the upcoming Vista operating system, but that the class

25  members did not receive computers with the Vista capability for which they had

26  paid.  *See Microsoft* at *11-*12.  Similar to the class in *Microsoft*, a central

27  allegation of the members of the proposed Class here is that they paid a higher

28  price to Yahoo for advertisements that Yahoo promised would be "highly

targeted" using either the Sponsored Search or Content Match ad placements when they did not receive those promised placements.  Just as the *Microsoft* court found the common allegation of overpayment for goods and services not delivered as promised to satisfy the Rule 23(b) requirement of predominance, the proposed Class's allegation here of overpayment for advertising placement products not delivered as promised satisfies the element of predominance.

The grant of class certification in *Microsoft* strongly supports class certification here.  Notably, the *Microsoft* class was certified *without* the existence of a common contract such as the form contract Yahoo entered into with the members of the proposed Class.  Here, the common and predominating nature of the proposed Class's allegations is even more compelling, because the proposed Class members entered into the same form contract in which Yahoo *expressly* promised to deliver the Sponsored Search or Content Match in exchange for which the proposed Class members paid a premium price.

It is axiomatic in class actions that the ability to prove liability with respect to the entire class is sufficient to find that common issues predominate.  *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 148 (S.D.N.Y. 2002) ("Courts should particularly 'focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions.'" (quoting *Dura-Built Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981)); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues.").  Here, the answer to the common liability question, whether favorable or unfavorable to Plaintiffs, will also answer the same issue for every class member, namely whether placing and charging for ads displayed irrespective of a Sponsored Search or a Content Match is a breach of contract.

/ / /

1       The *California Civil Code* and long-standing case law make it abundantly

2   clear that a finding of predominance is strongly supported by the proposed Class

3   members' claims.  All of these authorities instruct that differences in the existence

4   and amount of individual damages are not a bar to class certification.  *See Blackie*

5   *v. Barrack*, 524 F.2d at 905 (individual differences in damages do not defeat class

6   certification). [2]

7

8   ——————————————

9   [2]       A California statute also addresses this question, stating that "[w]hen a

10   breach of duty has caused no appreciable detriment to the party affected, he may

11   yet recover nominal damages." *Cal. Civ. Code* § 3360.  This rule has long been

12   the law in California, as evidenced by cases dating from the mid-19th century

13   through the 21st century.  The California Supreme Court stated the rule in

14   *Browner v. Davis* that "[i]n actions for the breach of a contract, nominal damages

15   are presumed to follow as a conclusion of law, from proof of the breach....", 15

16   Cal. 9, 11 (Cal. 1860), and reiterated the rule nearly 100 years later, explaining

17   "[f]or the breach of a contract an action lies, though no actual damages be

18   sustained." *McCarty v. Beach*, 10 Cal 461, 464 (Cal. 1958).  Recently, the

19   California Appellate Court rejected a contrary assertion, noting that the absence of

20   authority to support the notion that damages are an element of action for breach of

21   contract.  "In fact, in the absence of a showing of actual damages, nominal

22   damages are available." *Midland Pacific Building Corp. v. King*, 157 Cal. App.

23   4th 264, 275 (2007) (citing *Cal. Civ. Code* § 3360; *Sweet v. Johnson*, 169 Cal.

24   App. 2d 630, 632, 337 P.2d 499 (1959)).

    These California statutes and cases are consistent with the Restatement

(Second) of Contracts, which also expressly recognizes that liability for a breach

of contract exists even if no damages result or no damages are proven.  "A breach

of contract always creates a right of action; but a breach sometimes occurs without

causing any harm....  In all of these cases, the plaintiff can get judgment for

nominal damages." *Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, 2006 WL

3371690, at *20-*22 (D.N.J. Nov, 17, 2006) (citing Restatement (First) of

Contracts § 328)).  This principle is found in Restatement (Second) of Contracts §

346, which provides that "[i]f the breach caused no loss or if the amount of the

loss is not proved..., a small sum fixed without regard to the amount of loss will

be awarded as nominal damages." *See* Restatement (Second) of Contracts §

346(b); see also, Comment (b) to Restatement (Second) of Contracts § 346.

1    Applying the same analysis that the *Microsoft* court applied to that class's

2    unjust enrichment claim, it becomes equally clear that the proposed Class's claim

3    for unjust enrichment here should also be properly certified. *See Microsoft* at *14.

4    Here, the common questions of (i) whether Yahoo retained a benefit (in the form

5    increased advertising revenue), (ii) whether Yahoo knew of that benefit and (iii)

6    whether members of the proposed Class paid more than they should have (because

7    the advertising was not targeted, as promised), predominate over any individual

8    issues that may exist with respect to the proposed Class's claim for unjust

9    enrichment.  This is equally true for Plaintiffs' UCL and conspiracy claims, both

10   of which also depend on the predominant common liability question of whether

11   Yahoo inflated advertising charges by portraying Sponsored Search and Content

12   Match as "highly targeted" when, as in *Microsoft*, Yahoo did not deliver (and

13   never planned to deliver) such a product.

14   / / /

15   _____

16       This fundamental principle was explained by Judge Posner in *Hydrite*

17   *Chem. Co. v. Calumet Lubricants Co.*, in which he observed that, unlike in tort

18   cases, "[l]iability in a contract case… does not depend on proof of injury.  Proof of

     liability is complete when the breach of contract is shown."  47 F.3d 887, 890-91

19   (7th Cir. 1995).

20       In *Bayshore Ford Truck*, Ford Motor Co. argued that the plaintiff class's

21   claims for breach of contract failed the predominance test because the issue of

     damages was an essential element of a breach of contract claim that had to be

22   proven individually.  However, properly applying this rule, the court rejected

23   Ford's arguments and explained that damages need not be proven in order to

     establish liability for breach of contract.  *Bayshore Ford Truck*, 2006 WL

24   3371690, at *18.  Explaining the rule from the Restatement (Second) of Contracts,

25   the court observed that "proof of a breach of contract establishes liability for the

     breach and automatically entitles the breach victim to damages – regardless of

26   whether actual damages are suffered or are insubstantial." *Id*. at *19.  Thus, the

27   common issue of Yahoo's liability for breach of the form contract into which it

     entered with the members of the proposed Class predominates over any individual

28   question that may exist.

1    Hence, each of Plaintiffs' claims for relief embraces a common,

2   predominating question that each member of the Class would also have to confront

3   and prove if each proceeded individually, making a representative trial on the

4   merits not just appropriate but also a necessary and efficient means to ensure

5   access to justice for all class members.

6         **2. Class Treatment is the Superior Method to Resolve**

7            **This Case.**

8    In this case, it is clear that class certification is justified to resolve the

9   common questions discussed above, rather than requiring tens of thousands of

10   claimants each to prove in serial trials that Yahoo breached its contract by failing

11   exclusively to provide Sponsored Search and Content Match.

12         When common questions present a significant aspect of the
           case and they can be resolved for all members of the class in a
13         single adjudication, there is clear justification for handling the
14         dispute on a representative rather than on an individual basis.

15

16   *Hanlon*, 150 F.3d at 1022 (citations omitted).

17    In *Hanlon*, consumers in several states filed complaints alleging that the

18   rear liftgate latches in the Chrysler mini-vans were defective.  The actions were

19   consolidated for settlement purposes in the Northern District of California.  *Id.* at

20   1018.  The district court approved the settlement.  *Id.* at 1019.  Several objectors

21   to the settlement appealed to the Ninth Circuit.

22    The *Hanlon* court found the proposed class faced "the same problem:  an

23   allegedly defective rear latchgate which requires repair or commensurate

24   compensation."  *Id.* at 1021.  Similarly, the Plaintiff Class in this case has a single

25   interest:  to recover inflated charges and monies they expended on targeted,

26   Sponsored Search or Content Match Internet advertising, because Yahoo failed

27   exclusively to provide those products and failed to disclose that it would also

28   display random advertising for which it would charge its premium prices.

The Hanlon Court noted:

> Rule 23(b)(3) also requires that class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'  The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case.  This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution.  In this instance, the alternative methods of resolution are individual claims for a small amount of consequential damages or latch replacement.  * * * Even if efficacious, these claims would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs.  In most cases, litigation costs would dwarf potential recovery.  In this sense, the proposed class action is paradigmatic.  A fair examination of alternatives can only result in the apodictic conclusion that a class action is the clearly preferred procedure in this case.

*Id.* at 1023.

This is the precise procedural scenario that would be presented in this case if the Court were to decide against class certification.  There are multiple claims, but for comparatively small amounts.  Serial litigations of the same issues would not only burden Plaintiffs with litigation costs that exceed recoveries, but also burden the Court with repetitive, duplicative claims.  Like the class's claims in *Hanlon*, the claims presented in this case are a paradigm for the issues that class treatment is intended to resolve.  A class action is superior.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IV.     **CONCLUSION**

        For the foregoing reasons, Plaintiffs respectfully ask the Court to grant their

Motion For Class Certification.

                                              Respectfully submitted,

Dated:  March ⁊, 2008

                                       By:  _____

                                              **KIESEL, BOUCHER & LARSON**
                                              Paul R. Kiesel
                                              8648 Wilshire Blvd.
                                              Beverly Hills, CA 90211
                                              (310) 854-4444
                                              **Liaison Counsel for Plaintiffs**


                                              **BONI & ZACK LLC**
                                              Michael J. Boni
                                              15 St. Asaphs Road
                                              Bala Cynwyd, PA 19004
                                              (610) 822-0200


                                              **DONOVAN SEARLES, LLC**
                                              Michael D. Donovan
                                              1845 Walnut Street, Suite 1100
                                              Philadelphia, PA 19103
                                              (215) 732-6067


                                              **LAW OFFICES OF BENJAMIN
                                              EDELMAN**
                                              Benjamin G. Edelman
                                              27A Linnaean Street
                                              Cambridge, MA 02138
                                              (617) 379-0820


                                              **Co-Lead Counsel for Plaintiffs**

## PROOF OF SERVICE

STATE OF CALIFORNIA            ) ss:
COUNTY OF LOS ANGELES )

      I am employed in the City and County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 8648 Wilshire Boulevard, Beverly Hills, California 90211-2910.

      On March 7, 2008, I served the foregoing document(s) described as: **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** on the interested parties by placing (  ) the original ( X ) a true and correct copy thereof in a sealed envelope addressed as follows:

## SEE ATTACHED SERVICE LIST

[X]    VIA OVERNIGHT MAIL:

      VIA : By delivering such documents to an overnight mail service or an authorized courier in an envelope or package designated by the express service courier addressed to the person(s) on whom it is to be served.

[ ]    VIA U.S. MAIL:

      I am readily familiar with the firm's practice for collection and processing of correspondence for mailing. Under that practice such envelope(s) would be deposited with the U.S. postal service with postage thereon fully prepaid, at Beverly Hills, California.

[ ]    VIA PERSONAL DELIVERY:

      I personally delivered such envelope(s) by hand to the offices of the addressee pursuant to CCP § 1011.

[ ]    VIA FACSIMILE:

      The interested parties receiving the above-referenced document via facsimile have agreed to accept same via facsimile transmission, and the facsimile transmission report indicated that the transmission was complete and without error. A copy of that report, which was properly issued by the transmitting machine, is attached hereto.

[ ]    STATE:

      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

[X]    FEDERAL:

      I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

      I declare under penalty of perjury under the laws of the state of California that the above is true and correct and was executed on March 7, 2008, at Beverly Hills, California.

                                _____
                                Julissa E. Salgueiro

1

In Re Yahoo! Litigation
United States District Court, Central District of California, Western Division
Master File No. CV06-2737 CAS (FMOx)

2

3

Michael J. Boni, Esq.
BONI & ZACK, LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Telephone: 610/822.0200
Facsimile: 610/822.0206
Co-Counsel for Plaintiffs

4

5

6

Michael D. Donovan, Esq.
DONOVAN SEARLES, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone: 215/732.6067
Facsimile: 215/732.8060
Co-Counsel for Plaintiffs

7

8

9

10

Benjamin G. Edelman, Esq.
LAW OFFICES OF BENJAMIN
EDELMAN
27A Linnean Street
Cambridge, MA 02138
Telephone: 617/359.3360
Facsimile: 309/431.8532
Co-Counsel for Plaintiffs

11

12

13

14

15

Marc Edelson, Esq.
EDELSON & ASSOCIATES
45 West Court Street
Doylestown, PA 18901
Telephone: 215/230.8043
Facsimile: 215/230.8735
Co-Counsel for Plaintiffs

16

17

18

19

20

Alan M. Feldman, Esq.
Thomas More Marrone, Esq.
FELDMAN, SHEPHERD,
WOHLGELERNTER &
TANNER
1845 Walnut Street, 25th Floor
Philadelphia, PA 19103
Telephone: 215/567.8300
Facsimile: 215/567.8333
Co-Counsel for Plaintiffs

21

22

23

24

25

Dennis L. Wilson, Esq.
Emil W. Herich, Esq.
KEATS, MCFARLAND & WILSON LLP
9720 Wilshire Boulevard
Penthouse Suite
Beverly Hills, CA 90212
Telephone: 310/248.3830
Facsimile: 310/860.0363
Counsel for Defendants

Jonathan Shub, Esq.
SHELLER, LUDWIG & BADEY, P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
Telephone: 215/790.7300
Facsimile: 215/546.0942
Co-Counsel for Plaintiffs

Oren Giskan, Esq.
GISKAN & SOLOTARNOFF
207 West 25th, 4th Floor
New York, NY 10001
Telephone: 212/475.0099
Facsimile: 212/473.8096
Co-Counsel for Plaintiffs

Lisa J. Rodriguez, Esq.
Donna Siegel Moffa, Esq.
TRUJILLO RODRIGUEZ & RICHARDS
LLC
8 Kings Highway West
Haddonfield, NJ 08033
Telephone: 856/795.9002
Facsimile: 856/795.9887
Co-Counsel for Plaintiffs

26

27

28